RANDALL S. LUSKEY (SBN 240915)
   rluskey@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile:  (628) 432-3101

*Counsel for Defendant*
GRISELDA CANCELADA LICEAGA

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>   v.<br><br>GRISELDA CANCELADA LICEAGA,<br><br>            Defendant. | Case No.: 4:22-cr-00361-JSW-2<br><br>**DEFENDANT GRISELDA CANCELADA LICEAGA'S SENTENCING MEMORANDUM**<br><br>Hearing Date:   October 1, 2024<br>Hearing Time:   1:00 p.m.<br>Judge:           Hon. Jeffrey S. White<br>Dept.:            Courtroom 5, 2nd Floor |

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................... 1

II. BACKGROUND ............................................................................................................ 2

    A. Ms. Liceaga's Personal Characteristics ............................................................. 2

        1. Ms. Liceaga's Background .................................................................... 2

        2. Personal Testaments to Ms. Liceaga's Character ..................................... 3

    B. Hardships Facing Ms. Liceaga ........................................................................... 4

    C. The Instant Offense ............................................................................................ 5

III. LEGAL STANDARD .................................................................................................... 7

IV. ARGUMENT ................................................................................................................. 9

    A. Nature and Circumstances of the Offense ......................................................... 9

    B. History and Characteristics of the Defendant .................................................. 12

    C. Need to avoid unwarranted sentence disparities .............................................. 14

        1. Ms. Liceaga is, at most, equally culpable to Ms. Mora and Ms. Perez Ramirez .............................................................................................. 14

        2. Ms. Liceaga is less culpable than Mr. Ornelas Mora ............................ 15

V. CONCLUSION ............................................................................................................ 16

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*United States* v. *Amezcua-Vasquez*,
 567 F.3d 1050 (9th Cir. 2009)..................................................................................................14

*United States* v. *Booker*,
 543 U.S. 200 (2005)....................................................................................................................7

*United States* v. *Carty*,
 520 F.3d 984 (9th Cir. 2008)..................................................................................................7, 8

*United States* v. *Craig*,
 No. 11-CR-62, 2011 WL 6026616 (E.D. Wis. Dec. 3, 2011)..................................................11

*Gall* v. *United States*,
 552 U.S. 38 (2007)..................................................................................................................7, 8

*United States* v. *Gutierrez-Sanchez*,
 587 F.3d 904 (9th Cir. 2009)......................................................................................................8

*United States* v. *McCoy*,
 No. 3:21CR80(4), 2023 WL 4862678 (N.D. Ind. July 26, 2023)............................................11

*United States* v. *Menyweather*,
 447 F.3d 625 (9th Cir. 2006)....................................................................................................13

*United States* v. *Mohamed*,
 459 F.3d 979 (9th Cir. 2006)......................................................................................................8

*United States* v. *Ressam*,
 679 F.3d 1069 (9th Cir. 2012)....................................................................................................8

*United States* v. *Thurston*,
 544 F.3d 22 (1st Cir. 2008)......................................................................................................12

*U.S.* v. *Vasquez-Cruz*,
 692 F.3d 1001 (9th Cir. 2012)....................................................................................................8

*United States* v. *Zaragoza-Moreira*,
 780 F.3d 971 (9th Cir. 2015)....................................................................................................11

**STATUTES**

18 U.S.C. § 3553........................................................................................................7, 8, 9, 14

U.S.S.G. § 5K2........................................................................................................................8, 11

# I. INTRODUCTION

In her memoir, titled *My Beloved World*, Justice Sonia Sotomayor aptly observed, "Good people can do bad things, make bad decisions. It doesn't make them bad people."[1] Truer words could not be said for Griselda Cancelada Liceaga. She is a caring and loving single mother who has had to overcome serious challenges since arriving in the United States 18 years ago, including escaping an abusive relationship and being held at gunpoint during a robbery of her workplace, Rincon Musical. In the face of all of this, Ms. Liceaga has always worked to build an honest, safe and stable life for her and her son in the United States. During this time, Ms. Liceaga has become a valued member of her community known for her respectful and positive attitude, as well as her generosity towards others, even while bearing her own burdens. But like other good people, she went along with conduct she knew was wrong because she was scared for herself and her family. When her boss at Rincon Musical instructed her to conduct structured transactions for customers using identification from other people, Ms. Liceaga did not speak up or leave her job right away because that job was how she supported herself and her son. Ms. Liceaga is deeply remorseful for this mistake. And even after leaving that job and opening her own business to remover herself from the transactions she knew were wrong—thereby fulfilling a long-term dream of becoming a small business owner—Ms. Liceaga was still unable to escape the scheme she had become enmeshed in. The men she sent structured transactions for at her old place of business found her new store and demanded she continue to continue processing those same transactions for them, repeatedly threatening her and her son if she did not comply. Faced with these threats, Ms. Liceaga cooperated and continued sending illegal money transfers. Because of those transgressions, she now stands before this Court for sentencing, ready to accept whatever sentence the Court deems fair and just in this case.

This case represents Ms. Liceaga's first and only arrest and first and only contact with the criminal justice system. She has **never** been in trouble with the law prior to this matter and she has voluntarily provided information to the government repeatedly since her arrest. Her record on pretrial release is spotless and she has complied with all of her court-ordered obligations.

---

[1] Sonia Sotomayor, My Beloved World 251 (2013).

In determining the appropriate sentence, Ms. Liceaga asks the Court to take into consideration: (1) her personal and familial circumstances as a single mother singularly focused on supporting her son and keeping her family safe; (2) her relative role and culpability compared to others involved in the case, including her boss at Rincon Musical, Felipe de Jesus Ornelas Mora and her former colleagues who also sent structured transactions there, Veronica Mora and Yoselin Perez Ramirez; (3) the reasonable fear she felt in the face of the multiple threats to herself and her son from men who demanded she continue conducting unlawful money transfers; and (4) her repeated attempts at cooperation with the government and perfect compliance with her conditions of release in the years that this case has been pending. Ms. Liceaga respectfully requests that the Court imposes a probationary sentence of three years with eight months home confinement with electronic monitoring, which would be "sufficient" and "not greater than necessary" to fulfill the statutory objectives of federal sentencing.

## II.  BACKGROUND

### A.  Ms. Liceaga's Personal Characteristics

#### 1.  Ms. Liceaga's Background

Ms. Liceaga was born in 1983 in Guadalajara, Mexico where she resided until her early-twenties. (PSR ¶ 79.) Ms. Liceaga was raised as one of eight children in a stable, loving family and enjoyed playing volleyball and basketball when she was young. Her parents were small business owners and her family prides itself on being entrepreneurial. She often helped her mother—a significant influence in Ms. Liceaga's life—at the grocery store she owned before her mother suddenly died of a heart attack in 2004. The death of her mother had a profound impact on Ms. Liceaga, who said that it "felt like a temple collapsed." (*Id.* ¶¶ 79-80.)

Ms. Liceaga completed high school at Prepatoria Santa Anita in Guadalajara and started a relationship with Claudio Fernando Sierra Franco ("Claudio") in the early 2000s. She was admitted to university to study to be a dental assistant but decided not to attend because she was pregnant at the time with Claudio's child. In 2006, shortly after giving birth to her son, Christopher Giovanni Sierra Liceaga ("Christopher"), Ms. Liceaga traveled to the U.S. and ultimately settled with Claudio's family in Oakland. Since separating from Claudio in 2009, Ms. Liceaga has lived as a

single mother in apartments in Hayward, Oakland and Castro Valley, California.

At the time of Ms. Liceaga's sentencing, Christopher is 18 years old and has grown up in the San Francisco Bay Area after being brought to the U.S. as an infant. In addition to his studies, Christopher worked part-time jobs through high school and he is known among his community to have good manners and a serious, calm demeanor. (*See* Decl. of Randall S. Luskey ("Luskey Decl.") Ex. A, at 16, 21.) Having recently graduated high school in May 2024, Christopher has indicated that he is interested in studying to be an electrician and pursuing a career with Pacific Gas & Electric.

Ms. Liceaga has always worked hard to support her family. After working a variety of jobs between 2006 and 2009, often holding two jobs or more at a time including at a car wash, at the Salvation Army, and at a store that sold music, Ms. Liceaga started working at Rincon Musical, where she was hired in 2009 by the owner of the store, Felipe de Jesus Ornelas Mora. (PSR ¶ 94.) Later, after saving some money, Ms. Liceaga took initial steps towards opening her own store in San Leandro, California. She was motivated by her family tradition of being small business owners, but she was ultimately unsuccessful and abandoned the attempt, remaining in her position at Rincon Musical. Ms. Liceaga ultimately successfully opened her own business, America Latina, in 2021, which she saw as a source of stability for her and her son, and she even thought that Christopher may some day take over the store from her.

### 2. Personal Testaments to Ms. Liceaga's Character

Ms. Liceaga's character, work ethic and positive influence on her community is widely recognized, as demonstrated by the twenty members of her family and East Bay community who wrote letters of support in connection with her sentencing. These letters consistently highlight that Ms. Liceaga is a hard worker and a woman of admirable and honest character who is a generous friend and an excellent mother, and who has always prioritized the safety and well-being of her child as she repeatedly overcame grave difficulties. Take for example, Janis Revulcaba, a former coworker who has known Ms. Liceaga for 17 years, who praised Ms. Liceaga's "dedication to her family" and "determination to provide for them" as well as "her reliability, hard work, and unwavering commitment to helping others" and that she has "no doubt that [Ms. Liceaga] will

continue to thrive and contribute positively to her community." (Luskey Decl. Ex. A, at 27-28.) Bany Ismael Albarenga, a former client of Ms. Liceaga's at Rincon Musical who has known her for seven years, recognized how Ms. Liceaga "always endeavors to raise her son" and "extends a hand to those who need it most, seeking to help others as she can." (*Id.*, at 5.) Ms. Liceaga is also recognized as being accepting to others, such as Noel Alexander Reales, who met her 16 years ago when he and Ms. Liceaga worked at adjoining businesses. Mr. Reales appreciated Ms. Liceaga's compassion as "a steadfast source of support" when he was "in the process of coming out and accepting [him]self as a gay man." (*Id.*, at 39.) Despite the many "obstacles and challenges that [Ms. Liceaga] has confronted" Claudia Leticia Hernandez Lopez, a parent of a child in the same school as Christopher, noted that Ms. Liceaga has remained "a great person who is always helping and supporting others." (*Id.*, at 16.)

**B. Hardships Facing Ms. Liceaga**

Since arriving in the U.S. in 2006, Ms. Liceaga has faced enormous adversity within her abusive relationship with Claudio and when raising Christopher as a single mother.

After arriving in the U.S. with Claudio in 2006, Ms. Liceaga was the sole financial supporter of Claudio's family's household and she worked multiple jobs to support them. (PSR ¶¶ 81-83, 93-94.) During this period, Ms. Liceaga supported Claudio, paying for his schooling, gas and food and yet Claudio was physically and emotionally abusive towards Ms. Liceaga, hitting her approximately once or twice per week. (*Id.* ¶ 87.) Claudio's family was also emotionally abusive towards Ms. Liceaga, reminding her that she was alone in the U.S. without their family and saying that her family in Mexico must not love her because they did not come with her from Mexico. (*Id.* ¶ 83.) Ms. Liceaga's friends were aware of the significant physical and mental abuse she faced during this time and often saw her with bruises from this horrific abuse. (*Id.* ¶ 87). Specifically, Janis Revulcaba observed that Griselda was "the primary breadwinner of the household while Claudio did not work." (Luskey Decl. Ex. A, at 27.) Noel Alexander Reales also recalled that "Claudio and his family were manipulative and abusive" and "I witnessed Griselda come to work with bruises on several occasions." (*Id.*, at 39.) In addition to being abusive, Claudio was largely an absent parent and after initially separating from Claudio in 2009, Ms. Liceaga fully moved away

from Claudio's family home in 2011, retaining full custody of Christopher in order to raise him as a single mother. (PSR ¶¶ 83, 85.) She has not had any contact with Claudio for the last eight years.

Ms. Liceaga was also the victim of a violent crime, which was a traumatic experience for her. While working at Rincon Musical in 2016, Ms. Liceaga was held at gunpoint and directed to put money from the cash register in a bag. (*See* Luskey Decl. Ex. B.) Although she was not harmed during the robbery, Ms. Liceaga was terrified in the aftermath due to the threats of physical harm towards her and at the thought of her son, who was 10 years old at the time, being left without a mother. (*See* Luskey Decl. Ex. E.)

**C. The Instant Offense**

After Ms. Liceaga had worked at Rincon Musical for four years, the owner, Mr. Ornelas Mora, decided to start offering money transmitting services in 2013. Ms. Liceaga had no prior background or experience in money transmitting. As an employee at Rincon Musical, Ms. Liceaga was trained on how to perform money transfers by Mr. Ornelas Mora and she was trained periodically on anti-money laundering topics by the Money Service Business. (PSR ¶¶ 13, 45.) Ms. Liceaga performed money transfers for customers at Rincon Musical starting in 2013.

In 2020, Ms. Liceaga was working at Rincon Musical when Mr. Ornelas Mora met several men who instructed Mr. Ornelas Mora how to conduct structured transactions using other people's identifications as the "sender" to avoid having their real identities linked to transfers. Mr. Ornelas Mora then taught Ms. Liceaga how to conduct these transfers and instructed her to do so for these men when they came into the store. (*Id.* ¶ 45.) Ms. Liceaga complied with this direction.

As time passed, Mr. Ornelas Mora also instructed other new employees how to conduct these structured transactions, including Ms. Mora and Ms. Perez Ramirez. (*Id.* ¶¶ 45-46.) In response to questions about the propriety of conducting these transactions, Mr. Ornelas Mora assured Ms. Liceaga and the other employees that he would be responsible for the transfers because he was the owner of the store. Despite these assurances, Ms. Liceaga knew that the transfers were unlawful because of the anti-money laundering training she had received but she felt that she would lose her job and her ability to support her and her son if she reported the transfers or refused to continue performing the transactions.

Ms. Liceaga does not and will not make excuses for her conduct. There are none. She is disgusted and dismayed that she went along with this scheme. She cannot, to this day, believe that she betrayed her ethical code and jeopardized her ability to be present for her son. However, Ms. Liceaga did not conduct these transactions at Rincon Musical out of greed or ambition. Instead she was driven by the fear of losing her job and being unable to support her and her family. At the same time, Ms. Liceaga was also worried that continuing to conduct structured transactions using other people's identifications was illegal and could disrupt her and her son's pending U-Visa Application. Ultimately, after a year of conducting transfers for these men at Rincon Musical, she decided to leave Rincon Musical in spring 2021 and to open her own store.

Unlike in 2018, when she was unable to open her store in San Leandro, Ms. Liceaga successfully opened her own store, America Latina, in May 2021, which offered shipping and packaging services, pre-paid phones and money transfers. Using the knowledge, training and experience that she gained when working at Rincon Musical, Ms. Liceaga only intended to conduct lawful money transfers for customers. Less than a month after the store opened, however, one of the men she recognized to have sent unlawful transfers at Rincon Musical came to America Latina in a fancy car with multiple other men who waited outside her store as he entered. He asked Ms. Liceaga to send transfers for him in the same manner that she had done at Rincon Musical and, when she initially refused, the man said he was not asking her, but was ordering her to do so. Ms. Liceaga had seen this man arrested before and she knew him to be dangerous so she was afraid that she and her family would be harmed if she refused. Additionally, Ms. Liceaga's boyfriend at the time, who was also working in the store, recognized the men who waited outside of the store to be members of dangerous gangs from Honduras. (*See* Luskey Decl. Ex. C, at ¶¶ 6-7.)

After conducting unlawful transactions for several months for other men who identified themselves as working with the man who threatened her, Ms. Liceaga again became worried about the potential consequences to her son if she continued to do so because she understood the transfers to be illegal. In November 2021, she again refused to conduct transactions for some of the men who came to her store to perform structured transfers. Within 24 hours, Ms. Liceaga's store was broken into and trashed, but nothing was stolen. Ms. Liceaga filed a police report, but the police

were not able to identify the perpetrators. (*See* Luskey Decl. Ex. D.)

Ms. Liceaga reopened her store within a few weeks with improved security measures. Within days of reopening her store, another man arrived and asked Ms. Liceaga to conduct unlawful transfers for him. She again refused. After being refused, the man took out his phone and showed Ms. Liceaga and her boyfriend at the time, who was also working at the store, a photo of Ms. Liceaga's son, Christopher, leaving school with his friends. He said that "we know where your son studies" and that he was not asking Ms. Liceaga to conduct the transaction, but he was ordering her to do so. (*See* Luskey Decl. Ex. C, at ¶¶ 8-9.) Ms. Liceaga was terrified for her son's safety and complied, sending the transaction because she was afraid that her son would be beaten, kidnapped or even killed if she did not. Due to this threat, Ms. Liceaga was shaken and remained afraid for her and her son's safety and thereafter agreed to conduct similar transactions for others who came to her store.

This context in no way excuses Ms. Liceaga's conduct. However, it does provide some explanation: Ms. Liceaga was not driven by greed, but she was instead driven by fear and the desire to keep herself and her family safe. Ms. Liceaga knows she should have gone to the police sooner, but she was afraid of doing so because of the potential consequences for her U-Visa application, as well as the threats from men who she knew to be dangerous and powerful against her and her son. Even when Ms. Liceaga *did* call the police after her store was broken into, the police were ineffective at identifying the perpetrators so Ms. Liceaga remained afraid that those men could harm her or her family. Ms. Liceaga had been similarly afraid of reporting her domestic abuse by Claudio to the police. (*See* Luskey Decl. Ex. E.)

### III. LEGAL STANDARD

During sentencing, it is incumbent upon courts to "impose a sentence sufficient, but not greater than necessary," to accomplish the statutory objectives of 18 U.S.C. § 3553. To accomplish this charge, courts must begin their analysis by determining the applicable Sentencing Guidelines ("Guidelines") range. *United States* v. *Carty*, 520 F.3d 984, 990-91 (9th Cir. 2008).

As a result of the United States Supreme Court's decision in *United States* v. *Booker*, 543 U.S. 200 (2005), however, the Guidelines are no longer mandatory. *See Gall* v. *United States*, 552

1  U.S. 38, 46 (2007). Therefore, while the Guidelines remain the "starting point" of any sentencing
2  analysis, they are "not the only consideration" and should not be presumed to be reasonable. *See*
3  *Gall*, 552 U.S. at 49-50 (citing *Rita* v. *United States*, 551 U.S. 338, 347-48, 351 (2007)). Instead,
4  after determining the Guidelines' range, courts will consider the following factors delineated under
5  Section 3553(a) when determining whether a sentence is "sufficient, but not greater than
6  necessary": (1) the nature and circumstances of the offense; (2) the history and characteristics of
7  the defendant; (3) the need for the sentence imposed; (4) the kinds of sentences available; (5) the
8  kind of sentence and the sentencing range established in the Guidelines; (6) any pertinent policy
9  statement issued by the Sentencing Commission; (7) the need to avoid unwarranted sentencing
10 disparities; and (8) the need to provide restitution to victims. *See* 18 U.S.C. § 3553(a)(1)-(7);
11 *United States* v. *Ressam*, 679 F.3d 1069, 1089 (9th Cir. 2012) (quoting *Carty*, 520. F.3d at 991).
12 The "weight to be given [to] the various factors in a particular case is for the discretion of the
13 district court." *United States* v. *Gutierrez-Sanchez*, 587 F.3d 904, 908 (9th Cir. 2009). While the
14 Guidelines are to be respectfully considered, they are merely one factor within this 3553(a) analysis.
15 *Carty*, 520 F.3d at 991 (citations omitted).

16     Using its discretion, the Court should "consider every convicted person as an individual and
17 every case as a unique study in the human failings that sometimes mitigate, sometimes magnify,
18 the crime and the punishment to ensue." *Gall*, 552 U.S at 52 (quoting *Koon* v. *United States*, 518
19 U.S. 81, 113 (1996)). It is therefore empowered to vary from the Guidelines in appropriate cases.
20 *See United States* v. *Mohamed*, 459 F.3d 979, 987 (9th Cir. 2006). To this end, the Court can
21 consider a below-Guidelines sentence if a case "falls outside the 'heartland' to which the
22 Commission intends individual Guidelines to apply, U.S.S.G. § 5K2.0, . . . the Guidelines sentence
23 itself fails properly to reflect § 3553(a) considerations, or . . . the case warrants a different sentence
24 regardless." *See Carty*, 520 F.3d at 991 n.6 (quoting *Rita* v. *United States*, 551 U.S. 338, 351
25 (2007)).

26     Courts may look to the departure provisions under the Guidelines when imposing a sentence
27 under § 3553(a). *U.S.* v. *Vasquez-Cruz*, 692 F.3d 1001, 1008 (9th Cir. 2012) (observing that district
28 courts should not be discouraged "from taking guidance from all the Guidelines, including their

departure provisions"). Under U.S.S.G § 5K2.12, a defendant that "committed the offense because of serious coercion . . . or duress, under circumstances not amounting to a complete defense" may be granted a downward departure in consideration of the "reasonableness of the defendant's actions" and the nature of the threat to defendant.

## IV. ARGUMENT

The PSR calculates Ms. Liceaga's Total Offense Level as 17 and accurately reports that she has no criminal history, resulting in a Criminal History Category of I. Based on the Total Offense Level and Criminal History Category, the PSR calculates that the Guidelines recommended sentencing range is 24-30 months' imprisonment. (PSR ¶ 99.) Ms. Liceaga does not disagree with Probation's calculation of the applicable Guidelines Range. Ms. Liceaga understands that her co-conspirator, Felipe de Jesus Ornelas Mora also faced a sentencing range of 24-30 months and received a custodial sentence of 18 months from Your Honor.

Ms. Liceaga recognizes that she must be held accountable for her misconduct with punishment that is meaningful and sufficient. Nevertheless, Ms. Liceaga respectfully submits that a custodial sentence of 18 months is at odds with the nature and circumstances underlying her offense and disproportionate to the sentences typically imposed on similarly situated offenders. If followed, the Guidelines would result in a grossly unwarranted and unnecessary sentencing disparity.

Instead, as will be explained, each of the relevant Section 3553(a) factors, when applied to Ms. Liceaga's situation, compel, at the very least, a below-Guidelines sentence and, in this case in particular, a three-year probationary sentence with eight months of home confinement. Such a sentence would be sufficient, but not greater than necessary, to further the objectives of sentencing and punish Ms. Liceaga for her criminal conduct.

### A. Nature and Circumstances of the Offense

To begin, the nature and circumstances of Ms. Liceaga's offense warrant a below-Guidelines sentence. There is no question that Ms. Liceaga's crime was serious. Through her actions, Ms. Liceaga facilitated the transfer of funds across borders. Mr. Liceaga now appreciates that these transfers are a necessary link in the chain through which drug traffickers send drug

DEFENDANT GRISELDA CANCELADA
LICEAGA'S SENTENCING MEMORANDUM    -9-    Case No. 4:22-CR-00361-JSW-2

proceeds to their drug suppliers in Latin America. Ms. Liceaga structured larger sums of money into smaller transfers in amounts less likely to trigger scrutiny by the Money Service Business or law enforcement and she used names and photo identification of unrelated persons to conceal the identities of the actual senders. She did so while remaining willfully blind that there was a high probability that the money she was wiring was the proceeds of illegal drug sales. (PSR ¶¶ 11-13.)

Ms. Liceaga has demonstrably and genuinely accepted responsibility and shown complete remorse for committing the offense. (*Id.* ¶¶ 67-68.) She knows what she did was wrong and is devastated to have put herself and her family in this situation. Specifically Ms. Liceaga understands that conducting structured transactions using others' identifications without their permission was illegal and she knew that Mr. Ornelas Mora's assurances that he would be held responsible did not change the fact that the transactions they were sending were wrongful. Ms. Liceaga is devastated at the consequences of her actions and does not see anything redeemable about having committed the offense. She is painfully aware of the impact that her actions will have on her son and her family in Mexico. (*Id.* ¶ 57.)

This acceptance of responsibility and understanding of the wrongfulness of her conduct is also demonstrated by Ms. Liceaga's prompt and repeated attempts to cooperate with the government. Because she understood that what she did was wrong, Ms. Liceaga proactively offered to cooperate with the government immediately after her arrest. She repeatedly and proactively provided information to the government through multiple proffers, including an in-person proffer to the government just weeks after her arrest on October 4, 2022. Ms. Liceaga also repeatedly and proactively provided information through counsel to the government, including through email on March 9, 2023 and over the phone on January 2, 2024. These efforts are in keeping with her character and follow a pattern of cooperation with law enforcement after she gave a written statement to the police and offered to help if she could be of any assistance in the wake of the 2016 armed robbery of Rincon Musical. (Luskey Decl. Ex. B.)

Ultimately, Ms. Liceaga committed this offense because she was afraid. First, Ms. Liceaga was directed to conduct transfers by her boss Mr. Ornelas Mora, the owner of Rincon Musical. As a result, she was afraid that she would lose her job and therefore her ability to support her family if

she refused to conduct the transactions. She also did not speak up or go to the police out of fear of losing her job and because she was afraid of the men she was conducting transactions for, who she suspected were dangerous and involved with drug trafficking. (PSR ¶ 57.)

Motivated in part by the fear that continuing to conduct unlawful transfers could impact her and her son's pending U-Visa application, Ms. Liceaga made significant changes in her life in order to stop conducting unlawful transfers, including leaving her job at Rincon Musical and opening a new business. After having conducted exclusively lawful money transfers for seven years at Rincon Musical, Ms. Liceaga understood the skills she had learned to be a potential source of stable income and offered lawful money transmitting services. However, a powerful and dangerous man who used Rincon Musical to send money transfers also found her new store and threatened her if she did not agree to work with him. Ms. Liceaga resumed sending unlawful money transfers for this man and his colleagues out of fear for the safety of her and her family due to these threats. (*Id.* ¶ 57.) Although the PSR cautions that the Court may wish to consider that Ms. Liceaga "continued her conduct after starting her own company", the fact that she continued the unlawful conduct only after being threatened adds important context for the continuation of the offense conduct after Ms. Liceaga opened America Latina. (*Id.* ¶¶ 57, 120.)

After sending unlawful transfers for these men for multiple months, Ms. Liceaga again refused to continue sending money because of her knowledge that doing so was wrong. When her store was broken into that same night, Ms. Liceaga attempted to involve the police, but the police proved ineffective at catching or identifying the perpetrators. Although Ms. Liceaga thought the men may hesitate to come back after the police had investigated and after she installed additional security measures, the men returned after she reopened her store and showed her the shocking image that revealed that they could easily find and reach Ms. Liceaga's son, Christopher. Against this backdrop of the break-in to her business and the threats against her only child, Ms. Liceaga again agreed to continue conducting these transfers for these men. (*Id.* ¶ 57.)

Courts in the Ninth Circuit have acknowledged that evidence of a duress claim, "even if an imperfect defense" can be "***relevant as a mitigating factor at sentencing***." *United States* v. *Zaragoza-Moreira*, 780 F.3d 971, 981 (9th Cir. 2015) (citing 18 U.S.C. § 3553(a)(1) *and* U.S.S.G.

§ 5K2.12) (emphasis added). In similar instances where a defendant's family was threatened with injury and death or where the defendant was not motivated by profit, courts have observed that a downward variance due to these "demonstrably mitigating" facts "in a measure not quite captured by the [Guidelines] range." *United States* v. *McCoy*, No. 3:21CR80(4), 2023 WL 4862678, at *2-3 (N.D. Ind. July 26, 2023); *see also United States* v. *Craig*, No. 11-CR-62, 2011 WL 6026616 (E.D. Wis. Dec. 3, 2011) (granting a downward variance where "the circumstances of defendant's involvement were somewhat unusual . . . he acted, at least in part, to pay off a drug debt which was threatening the life of his nephew, not out of a profit motive or even because of his own drug problem."). Here, the mitigating circumstances of grave and repeated threats made against Ms. Liceaga and her child warrant a downward variance and a sentence far below the 24-30 month sentencing range proposed by the Guidelines and the 18 month sentence that Mr. Ornelas Mora received.

### B. History and Characteristics of the Defendant

As the PSR recognizes the "Court may wish to consider the defendant's lack of criminal history, her history of employment, and her history of abusive relationships" as factors that may warrant a sentence outside of the advisory guideline system. (PSR ¶ 120.)

Ms. Liceaga has no criminal history. (*Id.* ¶¶ 71-77.) This offense was her first and only run-in with the law. Accordingly, although her crime was serious, it is also equally true that Ms. Liceaga's crime was an aberration. Although Ms. Liceaga is generally healthy, and does not use any substances or drink alcohol, she has been prescribed antidepressants and has reported having suicidal thoughts as a result of this case. However, Ms. Liceaga has indicated that she is willing to participate in mental health treatment. (*Id.* ¶¶ 90, 92.)

As discussed above, Ms. Liceaga is an incredibly hard worker who has always provided for herself and her son. She has always had a job since arriving in the U.S. in 2006, and she has found work as a house and office cleaner since her arrest in 2022. (*Id.* ¶ 94.) Her family and members of her community also admire this work ethic, repeatedly noting that she is "very hard-working", and observing that she often "went out to work early to feed her son, buy him clothing and food." (*See* Luskey Decl. Ex. A, at 1-2, 7-9, 24, 27-28, 37-40, 41-42, 45, 48, 50, 55, 58, 61.)

Although not endowed with the means to live an overtly charitable and philanthropic lifestyle, Ms. Liceaga still is known to be generous and she supports her family and friends in the ways she is able. For example, Ms. Liceaga found ways to "financially support her family in Mexico" (PSR ¶ 87; Luskey Decl. Ex. A, at 11.) She also "extends a hand to those who need it most, seeking to help others as she can" and has an "unwavering commitment to helping others." (*See* Luskey Decl. Ex. A, at 5, 27.) Ms. Liceaga's influence in her community is evident from the fact that she has "become a godmother to . . . children" of friends, as well as close friends to former clients, coworkers and parents. (*Id.*, at 58.) This plainly warrants consideration of a below-Guidelines sentence. *See, e.g.*, *United States* v. *Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming district court's sentence of three months' incarceration rather than within the Guidelines' recommended range of 63 to 78 months' imprisonment, where, among other things, the court considered defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others").

The personal difficulties that Ms. Liceaga has had to overcome, and her current familial and immigration circumstances are another important consideration this Court should consider in determining an appropriate sentence. *See United States* v. *Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006), *overruled on other grounds*, *United States* v. *Munoz*, 621 F.3d 967, 969-70 (9th Cir. 2010) (noting that courts can consider family responsibilities when determining an appropriate sentence). As discussed above, Ms. Liceaga was the victim of violence and abuse by her former partner, Claudio, and his family from 2006 to 2011. (PSR ¶ 82.) She was also the victim of a violent crime as a result of the 2016 armed robbery at Rincon Musical, when the robber surprised her while she closed the store and held her at gunpoint as she emptied the cash register. (Luskey Decl. Ex. B). As a single mother to her 18-year old son, Ms. Liceaga has always gone above and beyond to ensure for her son's well-being, serving as "both a mother and father" to her son and she has "made countless sacrifices to ensure [her son] had everything [he] needed and wanted" and "she always prioritized [her son's] happiness and safety." (*See* Luskey Decl. Ex. A, at 8.) This singular focus on her son's well-being is demonstrated by Ms. Liceaga's decision to leave Claudio's family, and to move neighborhoods after Christopher was consistently bullied as a child.

Understanding that, at this moment more than ever, her son needs her, Ms. Liceaga has arranged for Christopher to stay with a friend's family because of the uncertain future that she faces. Without a doubt, Ms. Liceaga continues to serve an integral role as her son's mother and only parent, and her incarceration would therefore have a devastating impact on her and her son's lives. Finally, Ms. Liceaga and her son currently have pending applications for a U-Visa. (PSR ¶ 81.) As a result of this offense, both Ms. Liceaga and Christopher, who's visa application is contingent on his mother's application, may become deportable.

Ms. Liceaga fully appreciated the severity of the crime she committed, but the decisions she made out of fear for the safety of her and her son do not reflect her character or the life she has led. Ms. Liceaga's personal history and characteristics warrant a three-year probationary sentence with eight months of home confinement.

### C. Need to avoid unwarranted sentence disparities

In determining whether a sentence is sufficient, but not greater than necessary, the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). It is likewise important for courts to "avoid 'unwarranted *similarities* among [defendants] who were not similarly situated.'" *United States* v. *Amezcua-Vasquez*, 567 F.3d 1050, 1058 (9th Cir. 2009) (quoting *Gall*, 552 U.S. at 55). Here, a review of the relative culpability of Ms. Liceaga's co-conspirators establishes that a Guidelines' sentence in this case would be wholly unreasonable and that Ms. Liceaga should receive a sentence far below the 18-month sentence imposed on Mr. Ornelas Mora.

### 1. Ms. Liceaga is, at most, equally culpable to Ms. Mora and Ms. Perez Ramirez

Although they have yet to be sentenced, Ms. Liceaga should not receive any greater sentence than that imposed for her co-conspirators, Ms. Mora and Ms. Perez Ramirez. Like Ms. Mora and Ms. Ramirez, Ms. Liceaga attempted to cooperate with the government immediately after being arrested. The single criminal complaint against Ms. Liceaga, Ms. Perez Ramirez and Ms. Mora charges offense conduct common to all three co-defendants. (Complaint, ECF No. 1 at ¶¶ 45-46, 58, 76, 80, 83, 89, 96-99, 106, 109.) As employees of Mr. Ornelas Mora at Rincon Musical, the three women were similarly trained by Mr. Ornelas Mora and under the same pressure to obey

his directions to carry out unlawful money transfers.

Ms. Liceaga's decision to leave Rincon Musical to open her own store is not indicative of greater culpability. Ms. Liceaga left Rincon Musical in order to escape the unlawful conduct she was required to do to keep her job there and she sought to open her own store because she saw a possible future as a small business owner. Ms. Liceaga had previously attempted to open a store in 2018, two years before any unlawful money transfers were sent from Rincon Musical. By opening America Latina, Ms. Liceaga was following her family tradition of entrepreneurship and she saw a potential future of growing the business and handing it down to her son, who was close to graduating high school when she opened the store in 2021. It was only after she was threatened by the men who followed her to her new store that she resumed conducting unlawful transfers there. (*Id.* ¶ 57.)

### 2. Ms. Liceaga is less culpable than Mr. Ornelas Mora

Ms. Liceaga's sentence should be significantly lower than Mr. Ornelas Mora's sentence in order to reflect her relatively lower culpability. To start with, Mr. Ornelas Mora pleaded guilty to the same charge and the same loss amount as Ms. Liceaga, resulting in the same Guidelines range of 24-30 months. Against this backdrop, the Court sentenced Mr. Ornelas Mora to 18 months of incarceration, which is below this Guidelines range. (PSR ¶ 6.)

Mr. Ornelas Mora is significantly more culpable than Ms. Liceaga due to his leading role within the charged conspiracy. If Mr. Ornelas Mora had not started doing business with the men who taught him how to conduct unlawful transactions, or if he had not instructed his employees—including Ms. Liceaga—to conduct unlawful transactions for these men, then none of the other defendants would have learned to conduct such transactions. Instead, Mr. Ornelas Mora introduced these men to Ms. Liceaga and taught her and her colleagues how to conduct these unlawful transactions in the first place. By bringing his store and its employees into business with these likely drug traffickers, Mr. Ornelas Mora started the chain of events that culminated in the threats to Ms. Liceaga and her family and the difficulties she faced when trying to stop conducting these unlawful transactions. (*Id.* ¶¶ 45-46.)

Given the relatively lower culpability of Ms. Liceaga as compared to Mr. Ornelas Mora and

the similarity of the offense conduct of Ms. Liceaga's other two co-defendants, Ms. Mora and Ms. Perez Ramirez, a below-Guidelines sentence of three years of probation with eight months home confinement would be more than necessary to accomplish these goals.

## V. CONCLUSION

For the foregoing reasons, Ms. Liceaga requests that this Court sentence her to a three-year probationary sentence with eight months of home confinement, with electronic monitoring.

Respectfully submitted,

Dated: September 24, 2024

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

/s/ *Randall S. Luskey*
Randall S. Luskey (SBN 240915)
535 Mission Street, 24th Floor
San Francisco, CA  94105
Telephone: (628) 432-5100
Facsimile:  (628) 432-3101
Email: rluskey@paulweiss.com

*Counsel for Defendant*
GRISELDA CANCELADA LICEAGA

DEFENDANT GRISELDA CANCELADA
LICEAGA'S SENTENCING MEMORANDUM        -16-        Case No. 4:22-CR-00361-JSW-2